Lynn E. ZABEL, Personal Representative of the Estate of Beulah G. Palmer, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 4:96CV3469.

United States District Court, D. Nebraska.

Feb. 27, 1998.

Gary W. Radil & Gerald P. Laughlin, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, for Plaintiff.

Robert D. Metcalfe, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

Following a bench trial and subsequent briefing by the parties, I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). For the reasons set forth below, I find and conclude that judgment should be entered for the United States.[1]

## I. BACKGROUND

The plaintiff seeks a refund of federal estate tax and interest paid by the estate of Beulah G. Palmer ("the Estate") because of Defendant's denial of a charitable estate tax deduction to the Estate. Specifically, the Estate claims that 26 U.S.C. §§ 2055(a) & (e)(2) (Cum.Supp.1997) allow a charitable estate tax deduction for a contribution of the taxpayer's interest in property to a trust that was created partially to benefit charities.

Under certain circumstances, section 2055(e)(2) allows an estate to deduct the value of a bequest in trust to charities from federal estate taxes otherwise due the government even if individuals also receive income generated by the principal before the charities receive the remainder. However, only certain types of trusts will qualify for the charitable deduction when the individuals and the charities have "split interests" in the same property. *See* 26 U.S.C. §§ 2055(e)(2)(A) & (B).[2]

Here, the decedent bequeathed the residue of her estate to one trust. With a small exception, the residue was reduced to cash before the trust was funded. As to the income, 50 percent of the net trust income was to be distributed to two of the decedent's relatives for a period of 21 years or until their death (whichever took place first). The other 50 percent of the net trust income was to be distributed in equal shares to the two charities. When the individuals' right to receive income ended, what remained of the principal of the trust was to be distributed to the charities equally.

The Estate argues that the two charities have practically, although not legally, received half the trust since they have an immediate right to half the income and a remainder interest in all the principal. Therefore, the Estate argues that it is entitled to a charitable estate tax deduction as to 50 percent of the residuary estate since there is not a "split interest" as to that portion of the trust. This is true, so it is argued, even though the trust admittedly does not qualify under section 2055(e)(2)(A) (pertaining to charitable bequests in trust of remainder interests).

The Estate also argues that as to the other 50 percent of the bequest, the government should be estopped from denying the deduction because the government misrepresented the status of the case when it sent a letter to the Estate's lawyer. The government did not reveal that it was going to audit the estate tax return because of concerns about the charitable deduction. Had the government told the Estate's lawyer that it objected to the charitable deduction, the Estate argues that its lawyer could have and would have reformed the trust and qualified the other 50 percent of the trust for a charitable deduction. Instead, the time for reformation

---

1. Any finding of fact that is more properly construed as a conclusion of law shall be so construed. The reverse is true as well.

2. The statute reads as follows:

Where an interest in property (other than an interest described in section 170(f)(3)(B)) passes or has passed from the decedent to a person, or for a use, described in subsection (a), and an interest (other than an interest which is extinguished upon the decedent's death) in the same property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to a person, or for a use, not described in subsection (a), no deduction shall be allowed under this section for the interest which passes or has passed to the person, or for the use, described in subsection (a) unless—

(A) in the case of a remainder interest, such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5)), or

(B) in the case of any other interest, such interest is in the form of a guaranteed annuity or is a fixed percentage distributed yearly of the fair market value of the property (to be determined yearly).

ran out before the IRS informed the lawyer of the problem.

## II. FINDINGS OF FACT

1. The decedent, Beulah G. Palmer, a 92–year–old widow residing in Lincoln, Nebraska, died testate on July 2, 1993. (Filing 52, Order on Final Pretrial Conference, at 1.)

### *The Last Will and Testament of Beulah G. Palmer*

2. After cash bequests totaling $9,000.00 and specific bequests of personal items valued in the federal estate tax return at $550.00, paragraph 5 of the Last Will and Testament of Beulah G. Palmer provided as follows:

All the rest and residue of my estate I direct the Personal Representative to sell and convert into proceeds, from which shall first be paid all previously described debts, claims, and expenses, plus any and all U.S. Estate Taxes and State Inheritance taxes, it being my intention that all such estate expenses and death taxes shall first be paid out of estate residue and not assessed against the bequest of any specific legatee or beneficiary of my estate; and I devise and bequeath all such net residue proceeds of my Estate to the said Lynn E. Zabel, IN TRUST, for the benefit of the named beneficiaries hereinafter described, as follows:

(a) During the life of said testamentary trust, said Trustee shall prudently invest the trust assets and at end of each calendar quarter pay over all net trust income remaining after trust expenses on the following basis:

(1) Twenty (20) percent to my nephew, *Lee O. Gillespie,* now of Charlotte, North Carolina, for a period of 21 years or until his death, whichever comes first;

(2) Thirty (30) percent to my great niece, *Elaine Gillespie,* for a period of 21 years or until her death, whichever comes first;

(3) Twenty-five (25) percent to the *Trinity United Methodist Church of Lincoln, Nebraska* for a period of time equal of the life of the Trust;

(4) Twenty-five (25) percent to the *Nebraska Masonic Home* located in *Plattsmouth, Nebraska,* for the period of time equal to the life of the Trust; and

(5) In the event of the death of either Lee O. Gillespie or Elaine Gillespie prior to the expiration of twenty-one years after my death, their income share shall be divided on a prorata basis among the remaining income beneficiaries for the remaining life of the Trust;

(b) After the death of both the said Lee O. Gillespie and Elaine Gillespie, OR the expiration of 21 years from the date of my death, whichever event occurs first; the Trust shall be terminated and all net trust funds then remaining on hand, both principal and income, after final trust expenses, shall be distributed to the following two charitable beneficiaries:

One–Half share of the distributable trust assets to: The Trinity United Methodist Church of Lincoln, Nebraska; and

One–Half share of the distributable trust assets to: The Nebraska Masonic Home, situated in Plattsmouth, Nebraska;

it being my specific intention that the income of the trust shall be distributed to those named beneficiaries; but that in no event shall the life of the Trust extend beyond a period of 21 years after my death and that all Trust funds still in existence at the end of such period shall be distributed to the named charitable beneficiaries thus terminating the Trust. I nominate Union Bank & Trust Co. as alternate Testamentary Trustee if Lynn E. Zabel cannot serve as Trustee.

(Filing 52, Order on Final Pretrial Conference, at 1–3.)

3. The two charitable beneficiaries under the Last Will and Testament of Beulah G. Palmer, Trinity United Methodist Church of Lincoln, Nebraska, and the Nebraska Masonic Home located in Plattsmouth, Nebraska, are tax-exempt charities under the Internal Revenue Code. (Filing 52, Order on Final Pretrial Conference, at 5.)

4. Lawrence E. Murphy, the attorney who prepared Palmer's will, is confident that Palmer's will was an "exact reflection" of Palmer's wishes and that the will provided for one testamentary trust. (Tr. 103:5–104:4.)

5. The testamentary trust established in the Last Will and Testament of Beulah G. Palmer is not a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund as defined in 26 U.S.C. §§ 664(d)(1)-(3) and 642(c)(5). (Filing 52, Order on Final Pretrial Conference, at 5.)

### The IRS Audit

6. In order to close the sale of the decedent's house, Lynn E. Zabel, Personal Representative of the Estate of Beulah G. Palmer, filed an Application for Certificate Discharging Property Subject to Estate Tax Lien, which was stamped as received on August 11, 1993, by the Omaha, Nebraska, office of the Internal Revenue Service ("IRS"). Attached to this application was the Last Will and Testament of Beulah G. Palmer which included the above-quoted trust language. (Ex. 17.)

7. Gerald L. Adcock was the group manager of the estate and gift tax office of the IRS in Omaha, Nebraska, at all times relevant to this lawsuit. In that capacity, Adcock reviewed Zabel's application and the attached Last Will and Testament of Beulah G. Palmer, and signed a certificate discharging the Palmer property from an estate tax lien on August 12, 1993. (Tr. 44:18–46:21, 47:7–48:7; Ex. 18.) During Adcock's review of Zabel's application and the attached Palmer will, he decided there would be a problem with the deductibility of any charitable deduction sought and the estate tax return should be selected for an audit. At the time Zabel's release-of-lien request was processed, Adcock's assistant prepared a note which stated: "Select for audit 'charitable remainder trust appears defective' per GLA." (Tr. 47:23–48:7; 59:4–22; Ex. 19.)

8. Zabel then filed a United States Estate (and Generation–Skipping Transfer) Tax Return (Form 706) on behalf of the Estate of Beulah G. Palmer which was stamped as received by the IRS on September 28, 1993. (Filing 52, Order on Final Pretrial Conference, at 3.)

9. On Schedule O—page 31 (Charitable, Public, and Similar Gifts and Bequests) of the federal estate tax return filed by Zabel, the Estate of Beulah G. Palmer claimed a charitable deduction of $1,198,888.41 with respect to the bequest contained in paragraph 5 of the Last Will and Testament of Beulah G. Palmer. (Filing 52, Order on Final Pretrial Conference, at 3; Ex. 1.)

10. For internal use, the IRS issued Form 5546, Examination Return Charge–Out (ex. 3), bearing the following language and date stamp:

SELECTED

MAR 04 1994

DO 47 E & G

An identical language and date stamp is affixed on page 1 of the original Form 706, federal estate tax return, filed with the IRS on behalf of the Estate of Beulah G. Palmer. As explained by the IRS, the meanings for the lines and symbols in the stamp are as follows:

| | | |
|---|---|---|
| "SELECTED" | - | Selected for examination by IRS. |
| "MAR 04 1994" | - | Date when the federal tax return (Form 706) for the Estate of Beulah G. Palmer was selected for examination. |
| "DO 47 E & G" | - | District Office 47 (Omaha, NE) Estate & Gift Tax. |

(Filing 52, Order on Final Pretrial Conference, at 3.)

11. On May 12, 1994, Adcock prepared and sent a letter to Zabel at the office address of Lawrence E. Murphy because Murphy was the attorney who had prepared Palmer's will, the application for release of estate tax lien, and the federal estate tax return. (Tr. 88:13–23, 100:10–13; Exs. 4 & 5.) According to Adcock, this letter was the first contact between the IRS and the taxpayer regarding the Estate's tax return form. (Tr. 61:24–62:2.) At the time Adcock prepared and sent the letter, he knew that Zabel's estate tax return would be audited. (Tr. 60:5–20.) Despite this knowledge, Adcock's letter to Zabel stated only that:

We are reviewing the estate tax return identified above. We find we need more information. Please send the documents listed on the enclosure.

We would appreciate hearing from you as soon as possible. An addressed envelope is enclosed for your convenience.

If you have any questions, feel free to contact me.

(Exs. 4 & 5.) The information requested in the enclosure to the letter included information that was not required to be filed with the estate tax return. (Tr. 65:1–15.)

12. Adcock characterized his May 12, 1994, letter to Zabel as "a processing letter or perfection letter," which is a form letter normally used by Adcock's section in the Omaha, Nebraska, office of the IRS when estate tax forms raise questions that could possibly subject those forms to audit. When the taxpayer submits the additional information requested in the perfection letter, Adcock characteristically uses the information to "winnow[] out some of the returns that may have marginal issues or no issues at all." (Tr. 62:9–15; 76:17–19, 143:19–24.) If, after review of the additional documentation, the IRS decides that the tax return needs to be audited, the examining officer can begin the audit without taking time to assemble documentation. (Tr. 62:16–24; 86:3–7.) Adcock's section does not view the perfection letter as the IRS's "first contact" with the taxpayer within the meaning of Internal Revenue Manual; rather, the "first contact" is made by the examining officer. (Tr. 69:8–18.)

13. In response to "internal processing requirements," Adcock's office "consciously . . . devised the processing letter to eliminate an indication that [the estate tax return] has been selected for audit." (Tr. 87:4–9.) Adcock testified that attorneys customarily understand that if they comply with the "perfection letter," in many cases the tax return will be accepted. (Tr. 87:13–17.) Consistent with this custom, attorney Murphy considered Adcock's May 12 letter to be "very administrative, very standard." (Tr. 93:1–7.)

14. Adcock's May 12, 1994, letter contained no affirmative misstatements. (Tr. 75:5–13; 112:16–19.)

15. If, in response to Adcock's May 12, 1994, letter, either Murphy or Zabel had telephoned Adcock to ask "what the [IRS] was really looking for in its review of the estate tax return for the estate of Beulah Palmer," Adcock would have told them that the IRS "[was] auditing the return for the charitable deduction issue." (Tr. 75:14–76:7; 81:18–25.)

16. On May 23, 1994, Adcock assigned the Estate's tax return to Kenneth M. Klausner, an examining attorney in Adcock's office. Adcock attached a note to the case file when he assigned it to Klausner which stated: "Ken: Please check out the charitable remainder deduction and discuss with me when you are ready to move on this case. The preparer was in law school when I was. It looks as if he made a terrible boner, so drop it to him gently. G.L. Adcock, E & G." (Tr. 65:19–66:4, 78:2–8, 118:1–3; Ex. 6.)

17. When Adcock wrote this note to Klausner, Adcock was aware that taxpayers may file federal estate tax returns within nine months of the date of death, and that taxpayers have 90 days from the date such returns are filed to reform the instrument. Because most tax returns are filed in the eighth month, and processing takes three to four months after filing, normally "[t]he reformation is a nonissue because the 90 days has already gone by before you ever get your hands on the return. In this case, the return was filed considerably ahead of the due date of the return." (Tr. 66:16–67:12.) Therefore, Adcock "thought the estate was already locked in" when he wrote the note to Klausner. (Tr. 67:17–19.)

18. On May 25, 1994, Adcock received the additional materials he had requested from Murphy and Zabel. (Ex. 7; Tr. 64:14–24.) It was "unusual" for an examining attorney, like Klausner, to be assigned to a tax return before the response to the perfection letter was received. (Tr. 143:3–18.)

19. When Klausner received the Palmer file on May 23, 1994, he organized it, "thumbed through" the return, and placed it at "the back" of his inventory in his file cabinet. Because his file inventory was organized on a "first-in first-out" basis, Klausner did not begin to work on the Palmer file until "a few days prior to August 11[, 1994]." At that time, Klausner began to research chari-

**1042**

table remainder trusts, an area which was new to him. When Klausner, through his research, realized the 90–day reformation period had expired on or about July 2, 1994, he went to the Lancaster County Courthouse to view the Palmer probate file and confirm that no disclaimers or reformation actions were filed. (Tr. 118:22–119:11, 121:11–23, 141:7–8; Ex. 8.)

20. On August 15, 1994, Klausner sent a letter to attorney Murphy stating that Adcock had assigned this return to him for examination and that he needed additional documentation. The letter also stated: "I regret to inform you that the charitable deduction may be at risk of disallowance. I am currently researching the issue under section 2055(e) of the Internal Revenue Code, and I hope to find legal grounds for allowing the deduction." (Ex. 10.) Before receipt of this letter, Murphy had no "suspicion or concern about the allowability of the charitable deduction [he] had taken." (Tr. 94:24–95:3.)

21. No judicial proceeding was commenced to reform the provisions of the Last Will and Testament of Beulah G. Palmer dated May 24, 1989. (Filing 52, Order on Final Pretrial Conference, at 5.)

22. If the reformation period had not yet expired when Klausner began reviewing the Estate's tax return, he would have informed Murphy that "there was a 90–day period available to him." Klausner has "no doubt" that had such information been communicated to Murphy within the reformation period, Murphy could have cured the problem and obtained the charitable deduction. (Tr. 121:24–123:3, 128:23–129:3.)

23. On August 16, 1994, Murphy contacted a Nebraska attorney who is well known for his estate-tax expertise, from whom Murphy learned that the period in which to reform the trust in the Palmer will had expired on or about July 2, 1994. (Tr. 95:4–13.)

24. Murphy did not research the requirements for obtaining a charitable estate tax deduction under 26 U.S.C. § 2055 before drafting Palmer's last will and testament. (Tr. 101:12–16.)

25. Adcock views the Internal Revenue Manual as "a very good guide, but I don't think that you, you know, have to adhere to it at all times." (Tr. 71:20–21.)

### Deficiency Assessment & Claim for Refund

26. Following correspondence and conferences between the taxpayer's representative and its Appeals Officer, the IRS on August 25, 1995, issued a statutory notice of deficiency to the Estate of Beulah G. Palmer in the amount of $454,230.34, subject to a potential reduction for an additional state death tax credit, if substantiated, in the amount of $35,525.43, resulting in a net deficiency of $418,704.91, together with interest on the ultimate deficiency due. (Filing 52, Order on Final Pretrial Conference, at 4.)

27. The deficiency assessment by the IRS, in the statutory notice dated August 25, 1995, was based upon the determination by the IRS that the Estate of Beulah G. Palmer was not entitled to the charitable deduction provided by Section 2055(a) of the Internal Revenue Code for the asserted value of the charitable remainder interest bequeathed in trust to two charitable organizations; and the entire deficiency was attributable to disallowance of the charitable estate tax deduction. (Filing 52, Order on Final Pretrial Conference, at 4.)

28. On September 15, 1995, the Estate of Beulah G. Palmer paid to the IRS the sum of $452,000.00, representing payment in full of a net balance of federal estate tax of $398,476.69, plus accrued interest through September 15, 1995, of $53,513.82, for a total of $451,990.51, plus an overpayment of $9.49. (Filing 52, Order on Final Pretrial Conference, at 4.)

29. On March 12, 1996, the plaintiff, on behalf of the Estate of Beulah G. Palmer, filed with the Director of IRS for the Southwest Region a Claim for Refund of the deficiency plus interest paid, and a true copy of the Claim for Refund is attached as Exhibit "B" to the Complaint filed in this action. (Filing 52, Order on Final Pretrial Conference, at 4.)

30. More than six months elapsed between the filing of the Claim for Refund, dated March 12, 1996, and the commencement of the present civil action on December 17, 1996. (Filing 52, Order on Final Pretrial Conference, at 4.)

### Administration of the Trust

31. The residuary assets of the Estate of Beulah G. Palmer were delivered to the testamentary trust created under the Last Will and Testament of Beulah G. Palmer. (Filing 52, Order on Final Pretrial Conference, at 5.) The fair market value of the residuary assets on date of distribution to the trustee was slightly over $1,800,000. (Tr. 157:17–20.)

32. Lynn E. Zabel, who is both the Personal Representative of the Estate of Beulah G. Palmer and the Trustee of the testamentary trust created under the Last Will and Testament of Beulah G. Palmer, is not a relative of either Beulah G. Palmer or any beneficiary under such testamentary trust. (Filing 52, Order on Final Pretrial Conference, at 5, 6.)

33. Zabel has acted and continues to act as the Personal Representative of the Estate of Beulah G. Palmer and as the Trustee under the Last Will and Testament of Beulah G. Palmer. (Filing 52, Order on Final Pretrial Conference, at 6.)

34. Although only one trust was established by the Palmer will, Zabel "from the beginning" established "separate accounts" for each class of income beneficiaries—the individuals being one class and the charities being another class. To achieve such separate accounting, Zabel divided the trust assets and created separate investment accounts for each class of income beneficiaries and maintains these two accounts in identical fashion. As Zabel stated, "[t]he investment accounts are essentially identical carried out to three decimal places to the right." (Tr. 165:2–19; Exs. 23–25.) The only asset that was not divided between the two types of beneficiaries in this fashion was a "self-liquidating limited partnership" which pays a quarterly distribution of both income and principal. Zabel has divided this income evenly between the individuals and the charities. (Tr. 166:7–23.)

35. Zabel is unable to estimate how much the charitable beneficiaries will receive as their remainder interest in the trust when the individual beneficiaries no longer receive their income distributions. (Tr. 184:1–15.)

36. Zabel, in his representative capacity, is the proper party to receive any refund of estate taxes and interest as a result of allowance of a charitable estate tax deduction in the federal estate tax return filed for the Estate of Beulah G. Palmer. (Filing 52, Order on Final Pretrial Conference, at 6.)

## III. CONCLUSIONS OF LAW

As noted earlier, the plaintiff has two claims. First, the plaintiff claims that 50 percent of the trust qualifies for the charitable deduction. Second, the plaintiff argues that the government should be estopped from claiming that the other 50 percent of the trust fails to qualify for the charitable deduction because of a misrepresentation made by a government official in a letter to the Estate's counsel.[3] For the reasons stated below, I conclude that the plaintiff's claims must be denied.

### A. Does 50 Percent of Trust Qualify for the Charitable Deduction?

To understand the dispute regarding the first claim, understanding the statute governing deductibility of charitable bequests is necessary. After that, isolating what part of the statute the parties dispute is appropriate. Once we accomplish that task, the part of the statute subject to dispute can be interpreted by the court. Finally, we can apply the interpretation of the disputed part of the statute to the facts. I turn to those tasks next.

#### 1. Deductibility of Charitable Bequests

■ There is a general rule. It is found in 26 U.S.C. § 2055(a)(2). The general rule provides that an estate may deduct the value of bequests to charities from the estate tax due the government.

■ There is an exception to the general rule. The exception is found in 26 U.S.C. § 2055(e)(2). The exception generally disallows a charitable deduction for so-called

---

**3.** The plaintiff also claims that even if the Estate loses on its first claim, the estoppel claim will save 100 percent of the trust as a deduction. The argument here is that the entire trust, rather than just 50 percent of the trust, would have been reformed had the misrepresentation not occurred.

"split-interest" bequests made to a trust. The statute states that:

> [w]here an interest in property (other than an interest described in section 170(f)(3)(B)) passes ... from the decedent [for charitable purposes], and an interest ... in the same property passes ... [for noncharitable purposes], no deduction shall be allowed under this section for the interest which passes ... [for charitable purposes] *unless* [certain exceptions apply].

*Id.* (emphasis added).

The "unless" proviso in section 2055(e)(2) stipulates that a "split-interest" charitable bequest to a trust will be deductible if the bequest is structured in one of two ways. *See* 26 U.S.C. §§ 2055(e)(2)(A) & (B). A "split-interest" bequest of a remainder interest given to a charity in trust will be deductible if the interest in trust is in the form of a "charitable remainder annuity trust," or a "charitable remainder unitrust," or a "pooled income fund." *Id.* at § 2055(e)(2)(A). For an interest other than a remainder, a deduction will be allowed if "such interest is in the form of a guaranteed annuity or is a fixed percentage distributed yearly of the fair market value of the property" determined annually. *Id.* at § 2055(e)(2)(B).

### 2. The Dispute

The parties do not dispute that the general rule is that bequests to charities are normally deductible under section 2055(a)(2). The parties also do not dispute that section 2055(e)(2) governs bequests to charities made in trust.

It is also undisputed that the trust here is not a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund. (Filing 52, Pretrial Conference Order, at 5.) It is undisputed, therefore, that the trust cannot qualify for a deduction under section 2055(e)(2)(A).

Likewise, the plaintiff does not contend that the interest received by the charities in trust is an interest "other" than a remainder interest or, if it is, that "such interest is in the form of a guaranteed annuity or is a fixed percentage distributed yearly of the fair market value of the property (to be determined yearly)." Thus, the plaintiff does not contend that section 2055(e)(2)(B) applies.

The parties do argue about whether the language of section 2055(e)(2), appearing before the "unless" proviso, authorizes a deduction in the circumstances presented here. The government contends that this language plainly compels a disallowance of the entire value of the trust as a deduction. The government argues that:

> Section 2055(e)(2) of the code says that when you have successive interests ... [i]n the same property ... [t]hat pass to noncharitable and charitable beneficiaries [in trust], in order to qualify for the deduction provided by Section 2055(a) of the code, it must be in the form of a charitable remainder annuity trust [or other qualifying bequest under section 2055(e)(2)(A)].

(Tr. 222:1–14.)

The plaintiff concedes that the language of section 2055(e)(2) disallows a deduction for 50 percent of the trust. The plaintiff states the following:

> As to the first 50% portion, we readily concede that this is truly a split interest. *It is a circumstance in which there is a simultaneous bequest of an interest in the same property [to] two individuals and two charities.* We have the two individuals receiving an income interest, the charities getting the benefit of the remainder interest. As to that portion, we readily concede that we do not satisfy the requirements under the statute in order to obtain a charitable deduction, and the only way that we obtain one is if we prevail upon the argument of equitable estoppel.

(Tr. 201:18–202:2.) (Emphasis added.)

As to the remaining 50 percent, however, the plaintiff argues that such a bequest qualifies under section 2055(e)(2). The plaintiff argues that:

> However, as to the second portion, the 50% portion in which the two charities from inception have all the income and all of the principal, this is not a split interest. *There is no simultaneous bequest of an interest in the same property going to individuals and charities.* It's a law of physics that you can't occupy—two objects can't occupy the same place at the same time. As to that 50% portion, the charities

occupy all of the space. They get all of the income from inception, all of the principal. It is not a split interest.

And it is upon that basis that our position is that we are not subject to the disallowance provisions under 2055(e)(2) and that a charitable deduction should be allowable.

(Tr. 202:3–16.) (Emphasis added.)

Accordingly, I must decide the meaning of the following words of the pertinent statute:

[w]here an interest in property (other than an interest described in section 170(f)(3)(B)) passes . . . from the decedent [for charitable purposes], and an interest . . . in the same property passes . . . [for noncharitable purposes], no deduction shall be allowed under this section for the interest which passes . . . [for charitable purposes] . . . .

26 U.S.C. § 2055(e)(2).

### 3. The Meaning of Section 2055(e)(2)

#### (a) Rules of Construction

Before the meaning of section 2055(e)(2) can be learned, we must understand the rules of construction that apply to it. The following rules have been applied to the construction of section 2055(e)(2):

(a) In interpreting tax statutes, the literal meaning of the words employed is most important, and such statutes are not to be extended by implication beyond the clear import of the language used. Thus, the Court's first duty is to read the statute in its ordinary and natural sense.

(b) Where the meaning of the words used in the statute is doubtful, however, it is proper to resort to legislative history as an aid to construction, although such legislative history cannot be used to expand or contract the scope of the statute itself.

(c) Where a tax statute involves the allowance of a deduction or an exemption, it must be strictly construed.

*Estate of Cassidy v. Commissioner*, 49 T.C.M. (CCH) 580, 1985 WL 14672, at *3 (1985) (citations omitted).[4]

It is also helpful to state how the United States Court of Appeals for the Eighth Circuit has construed section 2055(e)(2). The Court, through Judge Richard Arnold, had occasion to interpret section 2055(e)(2) in *Oetting v. United States*, 712 F.2d 358, 360–61 (8th Cir.1983).[5]

Judge Arnold explained the purpose and meaning of section 2055(e)(2). He said:

Before discussing the parties' arguments, a few words about § 2055(e) are appropriate. This statute was enacted by Congress to eliminate an abuse of the charitable deduction through the so-called "split-interest bequest." Such a testamentary transfer involves the bequest of an interest in property to an individual with a

---

4. In that case, the decedent transferred a farm to a trust with a life income interest to the son and the remainder to a charity. Construing section 2055(e)(2) and section 170(f)(3)(B)(i), the court held that the bequest in trust to the charity did not qualify for a charitable deduction because it was a split interest prohibited by section 2055(e)(2).

5. In that case, the decedent's will created a split-interest trust that did not qualify as an annuity trust, a unitrust, or a pooled income fund. This trust was created to pay $100 per month to three elderly ladies for life. The remainder of $700,-000, more than 10 times what the decedent had expected when she drew her will, went to various charitable beneficiaries and one individual pursuant to the trust.

The trustees feared that they would be sued by the remaindermen for charging large trust administration fees for the limited purpose of paying the income beneficiaries only $3,600 per year. In other words, the cost of administering a trust having assets of $700,000 far exceeded the income beneficiaries' right to receive $3,600 per year. Accordingly, the trustees sought leave of a court to allow them to distribute most of the cash to the remaindermen, while purchasing annuities for the income beneficiaries.

A state court allowed the trust to pursue the proposed course of action, and the charities were given cash in lieu of their interest in the trust. The payments to the charities were made prior to the filing of the estate tax return, and the estate deducted those payments from the estate taxes. The government objected to the deduction, contending that the trust provisions of section 2055(e)(2) applied, and disallowed the deduction. The district court agreed with the government, and the taxpayer appealed.

The Court of Appeals held that section 2055(e) was not applicable. The court reasoned that state court decree changed what would have been a split-interest trust into a direct transfer to a charity. Thus, by its plain terms, section 2055(e)(2) did not apply to the cash payments to the charities since those payments were not in trust.

simultaneous bequest of an interest in the same property going to a qualified charity. Often this is accomplished by giving the income interest in a trust to an individual for life, with the remainder to charity. An estate could, under pre–1969 law, claim a charitable deduction for the present value of the remainder, computed by using actuarial life-expectancy tables and an assumed interest rate. The abuse occurred, Congress found, because "the rules for determining the amount of a charitable deduction in the case of gifts of remainder interests in trust do not necessarily have any relation to the value of the benefit which the charity receives." S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Admin.News 2027, 2116. This was because the trust corpus could be invested in high-income, high-risk assets so as to increase the value of the income interest but decrease the value of the charity's remainder interest. *The congressional response to this situation is contained in §§ 2055(e)(1) and (2), which disallow a charitable deduction for any split-interest bequest unless the remainder interest is in the form of a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund.*

*Id.* at 360–61. (Emphasis added.)

### (b) The Parenthetical Reference to Section 170(f)(3)(B)

Before going further, we must take a small detour. Section 2055(e)(2) begins with these words: "Where an interest in property (*other than an interest described in section 170(f)(3)(B)* ) passes ...." (Emphasis added.) What do these words mean?

Title 26 U.S.C. § 170(f)(3)(B) (Cum.Supp. 1997) allows charitable deductions for contributions, *not in trust,* of a partial interest in property under certain circumstances. *Compare* 26 U.S.C. § 170(f)(3)(A) (limiting deductions for contributions "*not made by a transfer in trust* " of a partial interest in property) (emphasis added) *with* 26 U.S.C. § 170(f)(3)(B)(i)-(iii) (providing exceptions to section 170(f)(3)(A)). *See also* 26 C.F.R. § 1.170A–7(b)(1998) (stating that: "A deduction is allowed under section 170 for a contribution *not in trust of a partial interest which*

*is less than the donor's entire interest in property* [under certain circumstances]." )

In fact, the parenthetical reference in section 2055(e)(2) to section 170(f)(3)(B) has been construed to mean that section 2055(e)(2) pertains to transfers of partial interests *in trust* as opposed to outright transfers of partial interests. *See, e.g., Estate of Cassidy,* 49 T.C.M. (CCH) 580, 1985 WL 14672, at *4 ("We think ... that it was the intent of Congress that where a remainder interest ... is given to a charity, such gift must either be made outright (i.e., free of trust) or in a trust which conforms to the requirements of sections 664 and 2055(e)(2)." ) (construing section 2055(e)(2) and section 170(f)(3)(B)(i)) (citing S.Rep. No. 91–552, 91st Cong., 1st Sess. (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2116–2121).

Accordingly, for our purposes we can properly construe section 2055(e)(2) as pertaining only to bequests of "split interests" in trust. We read the statute as if Congress wrote it this way:

> Where an interest in property ... passes [in trust] ... from the decedent [for charitable purposes], and an interest ... in the same property passes ... [in trust for noncharitable purposes], no deduction shall be allowed under this section for the interest which passes ... [for charitable purposes] ....

26 U.S.C. § 2055(e)(2).

In summary, it is undisputed that the transfer here was in trust. The parenthetical reference in section 2055(e)(2) to section 170(f)(3)(B) is, therefore, not applicable here.

### (c) The Meaning of Section 2055(e)(2)

We are now prepared to state the meaning of section 2055(e)(2). Judge Arnold said it best. Section 2055(e)(2) *"dissallow[s]* a charitable deduction for *any* split-interest bequest [in trust] *unless* the remainder interest is in the form of a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund." *Oetting,* 712 F.2d at 361 (emphasis added).

### 4. Application of Section 2055(e)(2) to the Facts

■ The facts are clear, and they are undisputed. The decedent intended to create one trust. Her lawyer followed her wishes exactly when he drafted the will. The will is unambiguous. It creates one trust, and that one trust continues to operate. The decedent split the interest in the trust principal and income between charitable and noncharitable beneficiaries. The individuals receive 50 percent of the income from all the principal. The charities receive the other 50 percent of the income, and a remainder interest in all the principal. The remainder interests cannot be distributed to the charities until the individual income interests cease. The interests of the charities are not protected by a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund. The trust has not been reformed to comply with section 2055(e)(2).

The statute *"dissallow[s]* a charitable deduction for *any* split-interest bequest [in trust] *unless the remainder interest is in the form of a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund." Oetting,* 712 F.2d at 361 (emphasis added). Accordingly, applying the plain words of the statute to the facts, we cannot sustain the plaintiff's claim that 50 percent of the trust qualifies for the charitable deduction.

■ The plaintiff, through his able trial counsel,[6] argues that it makes little sense to reject the charitable deduction for 50 percent of the trust. He argues that, as a practical matter, no harm can befall the charities, though the trust does not employ one of the three devices specified in section 2055(e)(2)(A). He stresses that, although there is only one trust, the trustee maintains separate accounts. The charities will not be harmed, he states, because the income and

principal interests in 50 percent of the trust have effectively (but not legally[7]) merged and belong to the charities.

I reject this argument because even if it were true, it is irrelevant. As Judge Wisdom has said in a similar case, "We consider the pertinent statutory language unambiguous. There is no justification for a judicial divination of an unstated congressional intent to make an exception for the bequest in this case." *Estate of Johnson v. United States,* 941 F.2d 1318, 1319–21 (5th Cir.1991) (holding that a trust to support the testator's sisters, to maintain graves of family members, and to pay for religious education in certain Catholic parishes did not qualify for a deduction under section 2055(e)(2) because the trust was not a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund).

Congress has the right to pick among various competing alternatives when specifying how a taxpayer must structure trusts to qualify for a tax exemption. The fact that the decedent may have chosen a different method, which is as good as the method chosen by Congress, does not mean that the decedent's choice trumps the Congressional choice of another method. Congress, not the taxpayer, defines the boundaries of tax exemptions. Simply stated, tax "statutes are not to be extended by implication beyond the clear import of the language used" and "[w]here a tax statute involves the allowance of a deduction or an exemption, it must be strictly construed." *Estate of Cassidy v. Commissioner,* 49 T.C.M. (CCH) 580, 1985 WL 14672, at * 3 (citations omitted).

Moreover, I am not persuaded that the predicate for this argument is correct even if the argument were relevant. Contrary to the plaintiff's assertion, the trust instrument does not provide the charities with the same

---

**6.** Counsel who now represent the plaintiff did not draft the will. Nor did trial counsel prepare the estate tax return.

**7.** The interests cannot legally merge for a number of reasons. Most obviously, the legal title is held by the trustee and the equitable title is held by the individuals and the charities. Moreover, the individuals have a right under the instrument to receive 50 percent of the income from all of

the principal. Thus, under the trust instrument, the principal of the entire trust is at risk for the purpose of generating income for the individuals. Since all the principal is at risk to generate income for the individuals, the trustee cannot determine precisely what the charities will ultimately receive until the income interests cease. Accordingly, no merger can take place until the income interests end.

level of protection that section 2055(e)(2)(A) requires.

Let us take an example using the trust instrument at issue. Assume the trustee invests 100 percent of the trust assets in junk bonds in the hope of generating the maximum income for the individuals who are entitled to receive 50 percent of the income from all the assets of the trust. Next, assume the bonds become worthless. The charities will lose all of the principal and all of their potential for income. The individuals will lose only the potential to receive income for a limited time.

Under the trust instrument, the individuals have no interest in the principal beyond the right to receive income from it. The income potentially distributable to them is unlimited; that is, the income is not set at a sum certain and it is not fixed as a percentage of the principal.

As a result, the individuals have every incentive to insist that the trustee take greater than normal risk with all of the principal.[8] Furthermore, since the trustee is not a charity, the trustee may elect to prefer the individuals' desire for high income over the charities' desire to receive a fair rate of return while preserving the principal.[9] In fact, except for general standards of prudence, there is nothing in this trust instrument that precludes such behavior.

To discourage trusts that provide an opportunity to reduce the value of a charitable remainder by investment speculation seeking high income, and thus an opportunity to overstate the value of the charitable deduction, section 2055(e)(2)(A) requires the use of one of three particular types of trusts. Those trusts either (1) use fixed payment formulas to set the payments to individuals before the remainder goes to the charities or (2) give control to the charities over the

investments before the remainder goes to the charities. See 26 U.S.C. § 664(d)(1) (1988) (charitable remainder annuity trust; individual payment must be fixed at a sum certain); 26 U.S.C. §§ 664(d)(2) & (3)(charitable remainder unitrust; individual payment must be fixed as a stated percentage of the annual value of the trust's principal and income); 26 U.S.C. § 642(c)(5) (Cum.Supp.1997) (pooled income fund; charity manages the fund). See also S.Rep. No. 91–552, 91st Cong., 1st Sess. (1969), reprinted in 1969 U.S.C.C.A.N. 2027, 2116 ("To provide a closer correlation between the charitable contributions deduction and the ultimate benefit to charity, . . . a deduction would no[t] be allowed for a gift of a remainder interest in trust to charity unless the gift took a specified form: namely, [a trust specified in section 2055(e)(2)(A)].").

The restrictions found in trusts specified by section 2055(e)(2)(A) reduce or eliminate the incentive to favor noncharitable beneficiaries by investing the principal in speculative investments. For example, an individual who is entitled annually to a sum certain equal to no more or less than five percent of the initial fair market value of the property transferred in trust, as in a charitable remainder annuity trust, has no incentive to insist that the principal be wagered in speculative investments to generate high income. This is true because the payment to the individual is not calculated upon income.

Likewise, a person who is entitled to receive no more and no less that a sum equal to five percent of the value of the trust determined annually, as in a unitrust, has little incentive to insist that the principal of the trust be invested in risky undertakings. The lack of incentive for income speculation exists because the individual beneficiary's payment by definition includes part of the trust princi-

---

**8.** Despite the accounting system used by the trustee, the individuals are entitled under the trust instrument to receive 50 percent of the income from *all* of the principal. Thus, the greater the return on all of the principal, the more income the individuals receive. Still further, even if the trustee uses separate accounts to provide the individuals with 100 percent of the income on 50 percent of the principal, the other 50 percent of the principal remains at risk to satisfy the individuals' income rights. For example, if the account paying the individuals 100

percent of the income from 50 percent of the assets failed, the individuals retain the right under the trust instrument to look to the remaining 50 percent of the principal to generate income for them. Consequently, the individuals have an incentive to urge the trustee to prefer relatively high income (and thus relatively high risk) investments for all the principal.

**9.** Let me make clear, however, that Mr. Zabel appears to have acted fairly in this case.

pal, and such a beneficiary therefore has an interest in preserving, rather than betting, the principal.

Similarly, in a pooled income fund, Congress has decreased the opportunity for speculation because a charity is required to manage the fund. Presumably, a charity entitled to receive the remainder will not make speculative investments of the principal.

A trust that lacks the characteristics required by section 2055(e)(2)(A) is not likely to reduce or eliminate the potential for abuse that Congress sought to address. I, therefore, reject the plaintiff's equivalent protection argument as factually unsupported.

### 5. Summary

We will deny the plaintiff's first claim. The trust does not qualify for a deduction under the plain words of section 2055(e)(2). In addition, the trust does not give the charitable beneficiaries protections equivalent to those required by section 2055(e)(2)(A).

### B. Is the Government Equitably Estopped from Defending This Suit?

The plaintiff's second claim is unusual. He argues that the government should be estopped from defending this suit. The factual components of this argument, which I assume to be undisputed, are these:

1. The Estate was not told that the return had been selected for examination regarding the charitable deduction when the IRS wrote the Estate on May 12, 1994, asking for information unrelated to the charitable deduction.

2. Instead, the Estate was told that the return was under "review," although the IRS believed that the trust did not qualify under section 2055(e)(2) and it intended to examine the return as a result.

3. Had the Estate's lawyer known of the IRS's concern about the charitable deduction, he would have checked the law and found that the trust did not qualify under section 2055(e)(2).

4. Upon discovery of the problem, the Estate's lawyer would have reformed the trust as permitted by section 2055(e)(3).[10]

5. By the time the IRS informed the Estate's lawyer of the problem on August 15, 1994, the last day to begin reformation of the trust (July 2, 1994) had passed.

To resolve this claim, we must examine the law of equitable estoppel. We must then determine whether equitable estoppel applies to the government, and, if so, under what circumstances. Then we must apply the law to the facts. I turn to those tasks next.

### 1. Equitable Estoppel

#### (a) Equitable Estoppel in General

■ Equitable estoppel is often thought to be defensive in nature. *See Restatement (Second) of Torts* § 894 (1979) (equitable estoppel as a defense). However, under certain circumstances it may be used offensively. *See, e.g., Restatement (Second) of Torts* § 872 (1979) (tort liability regarding misrepresentations concerning the ownership of property or its disposition based upon estoppel). Thus, equitable estoppel "is neither a claim nor a defense but is a means of precluding the assertion of a claim or defense against a party who has detrimentally relied on the conduct of the party asserting the claim or defense." *Olsen v. United States,* 952 F.2d 236, 241 (8th Cir.1991) (taxpayer failed to prove claim of estoppel in tax-refund suit when taxpayer failed to establish that any misrepresentations made by the government on which taxpayer relied caused him detriment).

■ As applied to a party other than the United States, the doctrine of equitable estoppel has three elements. *Bostwick Irr. Dist. v. United States,* 900 F.2d 1285, 1291 (8th Cir.1990) (in irrigation districts' suit to enjoin government from charging districts for expenses incurred by Army Corps of Engineers, court found no basis for estopping the government from asserting its claim to recover the Corps' costs since districts failed to establish the "ordinary requirements of estoppel"). First, the party against whom the estoppel is asserted "must make a misrepresentation or take an action with reason to believe that the other party will rely

---

**10.** This section permits an estate to reform a non-qualifying trust to qualify under section 2055(e)(2) if the estate begins the process by "the 90th day after ... the last date (including extensions) for filing such [estate tax] return." 26 U.S.C. § 2055(e)(3)(C)(iii)(I).

upon it." *Id.* at 1291. Second, the party claiming the benefit of the estoppel "must not have access to the truth." *Id.* Third, the party claiming the benefit of the estoppel "must rely upon the first party's action to its detriment." *Id.*

### (b) Equitable Estoppel and the United States

■ Whether equitable estoppel may be asserted against the United States is not clear. *See Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (government not estopped from recovering federal funds spent by non-profit corporation that provided health care services when corporation relied on express authorization of responsible government agent in spending federal funds). In any event, the law does not favor the use of equitable estoppel against the government. *Id.* This is because "the interest of the citizenry as a whole in obedience to the rule of law is undermined" when we preclude the government from enforcing the law because of the acts or omissions of government agents. *Id.* Accordingly, "it is well settled that the Government may not be estopped on the same terms as any other litigant." *Id.* Nevertheless, the Supreme Court has assumed that the doctrine may be asserted against the United States in egregious circumstances. *Id.*

■ The party asserting equitable estoppel must first prove the three "ordinary requirements" of the doctrine. *Bostwick*, 900 F.2d at 1291. In addition, a fourth element must be proven; that is, "affirmative misconduct" must also be shown. *Id. See also Olsen*, 952 F.2d at 241 ("In order for Olsen to prevail on estoppel he must prove that the IRS agents in addition to the ordinary elements of estoppel that the agents were guilty of affirmative misconduct."); *Free Enterprise Canoe Renters Ass'n v. Watt*, 711 F.2d 852, 857 (8th Cir.1983) ("In the absence of affirmative misconduct, the government may not

normally be estopped by misrepresentations or misinformation given by its agents.")

In summary, the doctrine of equitable estoppel as applied to the government requires proof of four elements. First, the United States "must make a misrepresentation or take an action with reason to believe that the other party will rely upon it." *Bostwick*, 900 F.2d at 1291. Second, the misrepresentation made, or action taken, by the United States must amount to "affirmative misconduct." *Id.* Third, the party claiming the benefit of the estoppel "must not have access to the truth." *Id.* Fourth, the party claiming the benefit of the estoppel "must rely upon the [government's] action to its detriment." *Id.*

### 2. Equitable Estoppel as Applied to the Facts

■ I conclude that the plaintiff has failed to prove all four elements necessary for the successful assertion of equitable estoppel against the United States. Briefly, the reasons for my conclusion are set forth below.

First, the plaintiff has failed to prove that Adcock's May 12, 1994, letter misrepresented the facts or amounted to the IRS trying to lull the Estate into complacency regarding the charitable deduction. The letter, which was a form letter sent in every case, stated that the IRS was "reviewing the estate tax return" and that "[w]e find we need more information." The letter asked for more information related to fees, income tax returns, and state inheritance and estate taxes.

There was nothing untrue or misleading about these statements. Moreover, nothing in the words of the letter can be read to imply that the IRS would accept the charitable deduction or the return as filed if the lawyer supplied the information sought in the letter. In fact, Adcock testified that these letters are sent in every case, whether the return is audited or not, and there is no "way you can read between the lines on these form letters to find out … what the service is getting at …." (Tr. 85:10–87:25.) [11]

---

11. In response to a question I put to Adcock, he stated that lawyers may assume that a letter like the May 12, 1994, letter means that the IRS will accept the return as filed if the information submitted in response to the letter is consistent with the law related to the particular issue addressed in the letter. (Tr. 86:8–15.) But, on follow-up questions by the government's able counsel, Adcock clarified that the letters were "consciously … devised … to eliminate an indication that [the return] has been selected for audit" and a lawyer could not "read between the lines on these form letters to find out … what the service is getting at …." (Tr. 86:25–87:19.)

The plaintiff argues that the letter amounted to a misrepresentation because it was the "first contact" after the estate tax return had been selected for an audit. The IRS Manual tells IRS agents that at the initial contact after the return has been selected for an audit, "the taxpayer or taxpayer's representative will be advised of all matters that will be covered during the examination to the extent identified during precontact analysis." (Ex. 20, IRS Manual, Part IV, § 4315.3(5) (8–31–90).)[12] Since the May 12, 1994, letter did not tell the Estate's lawyer that the return had been selected for an audit because of the charitable deduction, the plaintiff claims that the form letter was misrepresentative.

This argument fails for two related reasons. Initially, compliance with the "first contact" provision of the IRS Manual was not mandatory. Since 1986, the IRS has publicly declared that the Manual provisions relied upon by the plaintiff are "permissive" and "should not be considered as specific directions of a mandatory nature." (Ex. A, IRS Manual, § 4012(1) & (2) (8–1–86).)[13] Next, Adcock, who is a very experienced and credible senior IRS lawyer, believed that the May 12, 1994, form letter did not amount to an "initial contact." (Tr. 69:5–18.) Adcock believed that the "first contact" took place when the field examiner contacted the Estate to commence the audit process. (*Id.*) Because of these two facts, Adcock had no reason to think that the Estate's lawyer would believe that the May 12, 1994, letter amounted to a tacit acceptance of the charitable deduction.

Second, Adcock's conduct in sending the May 12, 1994, form letter did not amount to "affirmative misconduct" even if I assume that the letter misrepresented the status of the case. If Adcock should have revealed in the letter that the return had been selected for an audit because of concerns about the charitable deduction, Adcock's conduct was based upon a good faith interpretation of what the IRS Manual required.

Moreover, Adcock testified, without contradiction, that when he sent the form letter,

he had no intention to "lull the taxpayer, the personal representative, or its attorney into somehow believing that the service would allow the charitable estate tax deduction ...." (Tr. 76:8–16.) Adcock further stated, and I found him extremely credible, that had the Estate's lawyer asked about what was concerning the IRS, Adcock would have told the lawyer about his objection to the charitable deduction. (Tr. 75:19–23.)

As a matter of fact, because estate tax returns are normally filed near the end of the nine-month deadline and because IRS classification lawyers, like Adcock, seldom receive the returns until three to four months later, Adcock reasonably (but incorrectly) believed that the time for reforming the trust had expired by May of 1994. (Tr. 67:4–19.)[14] He therefore had no reason to try to lull the Estate into a sense of complacency. He "thought the estate was already locked in." (Tr. 67:19.)

In short, Adcock's misrepresentation, if it were one, was not the type of serious misconduct that can form the basis for equitable estoppel against the United States. *Compare Fredericks v. Commissioner of Internal Revenue,* 126 F.3d 433 (3rd Cir.1997) (conduct of the IRS (1) in representing to the taxpayer that Form 872–A, signed by him and granting an indefinite extension of the statute of limitations, was lost in the mail, (2) followed by the IRS obtaining Form 872 from the taxpayer, authorizing a limited extension of the statute of limitations, (3) followed by the failure of the IRS to disclose the discovery of the unlimited form submitted by the taxpayer, (4) followed by IRS use of the unlimited form, that had been allegedly lost, to make a deficiency assessment more than eight years after the limited form had expired, satisfied misrepresentation and affirmative misconduct elements of equitable estoppel doctrine).

Third, the Estate cannot show that it lacked access to the truth. Counsel for the Estate drafted the will. He prepared the

**12.** IRM 4315.3(5) (8–31–90), *available in* Westlaw, FTX–ALL.

**13.** IRM 4012 (8–1–86), *available in* Westlaw, FTX–ALL.

**14.** This case was unusual in that the Estate filed its return shortly after the decedent died.

estate tax return. Although he testified that he did not research whether the trust qualified under section 2055(e)(2) before he drafted the will (Tr. 101:12–16), we presume that he knew the law. *Heckler*, 467 U.S. at 63 (stating "that those who deal with the Government are expected to know the law ....."). Consequently, the Estate's ability to discover the truth (regarding whether the charitable deduction applied, whether the trust could be reformed, and what the time limits for reformation were), was unfettered by anything the IRS did or failed to do.

Fourth, the Estate cannot show detrimental reliance. Had Adcock not submitted the letter of May 12, 1994, there is no reason to believe that the Estate would have reformed the trust. The Estate's lawyer claimed the trust complied with the law when he filed the return. He filed the return months before he received Adcock's letter. There is no evidence that the Estate refrained from reforming the trust once it received the letter. After all, the letter did not mention the charitable deduction. In fact, there is no evidence that the Estate was planning to reform the trust when it received the letter. There is also no evidence that the Estate's plans were altered in any way when it got the letter. Accordingly, had the letter not been sent, the circumstances would have been the same; that is, the time for reformation would have passed, and the deduction would have been disallowed. As a result, the plaintiff has not proven reliance.

In summary, the Estate has failed to prove the four elements required for successful assertion of the doctrine of equitable estoppel against the United States. There was no misrepresentation, there was no affirmative misconduct, there was no lack of access to the truth, and there was no reliance.

## IV. CONCLUSION

The trust created "split interests" in the same property between charitable and noncharitable beneficiaries and the trust did not comply with the requirements of section 2055(e)(2)(A). Thus, the Estate is not entitled to the charitable deduction. Also, the Estate has not proven each of the four elements of equitable estoppel. Consequently, we may not preclude the United States from asserting the invalidity of the trust for charitable deduction purposes. Accordingly, we must enter judgment for the United States on the plaintiff's refund claim.

IT IS ORDERED that judgment will be entered by separate document providing that the plaintiff shall take nothing, judgment is entered in favor of the United States and against the plaintiff on the plaintiff's claim for a refund, costs are taxed to the plaintiff, and this case is dismissed with prejudice.